| | |
|---|---|
| DEREK SCOTT WILLIAMS PLLC and DEREK SCOTT WILLIAMS REAL ESTATE LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 20-cv-2806<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Derek Scott Williams PLLC and Derek Scott Williams Real Estate LLC ("Plaintiffs"), by way of complaint against defendant The Cincinnati Insurance Company ("Cincinnati") allege as follows:

## INTRODUCTION

1. On March 11, 2020, World Health Organization Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak to be a global pandemic.[1]

2. On March 16, 2020, the Centers for Disease Control and Prevention and members of the national Coronavirus Task Force issued the following guidance to the American public: "30 Days to Slow the Spread" for stopping the spread of COVID-19. This guidance advised individuals to adopt expansive social distancing measures, such as avoiding shopping trips and gatherings of more than 10 people, as well as working from home.[2]

---

[1] *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-COVID-1911-march-2020 (last accessed May 7, 2020).

[2] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last accessed May 7, 2020).

3.     Following this advice, state governments throughout the United States recognized the need to take steps to protect the health and safety of their residents from the human-to-human and surface-to-human spread of COVID-19. As a result, several state and local governments entered civil authority orders suspending or significantly limiting business operations of non-essential businesses that interact with the public and provide spaces in which to congregate. Currently, nearly all states in the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

4.     These expansive restrictions and curtailment of public movement have been devastating for most non-essential businesses, especially small businesses that have been forced to close, furlough employees, and face an abrupt downturn in cash flow that threatens their survival.

5.     Most businesses insure against unforeseen catastrophic events like the COVID-19 pandemic through all-risk commercial property insurance policies. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

6.     Defendant, and most insurers who have issued all-risk commercial property insurance policies with business interruption coverage, are denying their obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to their property from measures put in place by the governmental entities to stop the spread of COVID-19. Plaintiffs seek a declaratory judgment that affirms that the COVID-19

pandemic and corresponding response by civil authorities to stop the spread of the outbreak triggers policy coverage; has caused physical property loss and damage to the insureds' property; provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations; and finds that Defendant is liable for the losses suffered by policyholders.

7.     Plaintiffs bring this action on behalf of a proposed class of policyholders who paid premiums in exchange for an all-risk commercial property insurance policy that included lost business income and extra expense coverage.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists as Defendant is a citizen of a state different from that of at least one Class Member.

9.     This Court has personal jurisdiction over Defendant because it regularly conducts business in Illinois and has sufficient minimum contacts in Illinois such that Defendant intentionally avails itself of this Court's jurisdiction by conducting operations here and contracting with companies in this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the conduct alleged herein occurred in, were directed to, and/or emanated from this District. Venue is additionally proper because Defendant transacts business and may be found in this District.

## PARTIES

11.     Plaintiff Derek Scott Williams PLLC is a Texas corporation with its principal place of business in Lufkin, Texas. Derek Scott Williams PLLC operates a dental practice whose success depends upon the ability of patients to visit that facility.

12.     Plaintiff Derek Scott Williams Real Estate LLC is a Texas corporation with its principal place of business in Lufkin, Texas. Derek Scott Williams Real Estate LLC houses a dental practice whose success depends upon the ability of patients to visit that facility.

13.     Defendant Cincinnati is an insurance company organized under the laws of Ohio, with its principal place of business in Fairfield, Ohio. Cincinnati wrote approximately $218 million in direct premiums in Illinois for the year ending December 31, 2018.[3]

14.     Cincinnati issued to Plaintiffs Policy No. ECP 039 41 81 for the policy period between July 14, 2019 and July 14, 2020 (the "Policy").

15.     Plaintiffs have paid the policy premiums to Cincinnati specifically to provide for coverage of lost business income and extra expenses in the event of an involuntary business interruption.

## FACTUAL BACKGROUND

### A. The Global COVID-19 Pandemic

16.     In December 2019, an initial cluster of nine patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where

---

[3] *See* Schedule T, Statutory Annual Statement for the Cincinnati Insurance Company for the year ended December 31, 2018.

4

many non-aquatic animals such as birds were also on sale. However, one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[4]

17.     By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[5] SARS-CoV-2 is an RNA virus with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope. Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[6]

18.     The first confirmed case of the virus outside China was diagnosed on January 13, 2020 in Bangkok, Thailand with the number of cases only increasing worldwide. On January 30, 2020, the World Health Organization (WHO) declared that the SARS-COV-2 outbreak constituted a public health emergency of international concern and by February 11, 2020, the virus was named "COVID-19" by the WHO Director-General.[7] As of April 15, 2020, the WHO reported a confirmed 1.9 million cases of COVID-19 globally and over 123,000 deaths, with the United States dealing with more than 578,000 confirmed cases and 23,000 deaths - more than any other country.[8]

19.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care

---

[4] See https://www.mdpi.com/1660-4601/17/8/2690 (last accessed May 7, 2020) (as a typical RNA virus, the average evolutionary rate for coronaviruses is roughly 10–nucleotide substitutions per site per year, with mutations arising during every replication cycle).

[5] https://www.mdpi.com/1660-4601/17/8/2690 (last accessed May 7, 2020).

[6] See https://www.mdpi.com/1660-4601/17/8/2690 (last accessed May 7, 2020) (to address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes—30–32 kb— with a 50 -cap structure and 30 - poly-A tail.)

[7] https://www.mdpi.com/1660-4601/17/8/2690 (last accessed May 7, 2020).

[8] https://covid19.who.int/ (last accessed May 7, 2020).

unit (ICU). Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[9] There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[10]

20. Scientists have discovered that COVID-19 has several modes of transmission. According to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.[11] Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual. Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[12]

21. The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.[13] During this period, also known as the "presymptomatic" period, some infected persons

---

[9] *See* https://www.mdpi.com/1660-4601/17/8/2690 (last accessed May 7, 2020) (asymptomatic infections have also been described, but their frequency is unknown...Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.)

[10] *See* https://www.mdpi.com/1660-4601/17/8/2690 (last accessed May 7, 2020) (the treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection).

[11] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc72 (last accessed May 7, 2020)

[12] *See* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last accessed May 7, 2020) (data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in upper respiratory tract (nose and throat) early in the course of the disease. That is, within the first 3 days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.)

[13] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last accessed May 7, 2020).

can be contagious. For that reason, transmission from a pre-symptomatic case can occur before symptom onset. Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[14]

22.     Significantly, an individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to other individuals.[15] Not only is COVID-19 transmitted between human beings, but the WHO and scientific studies have confirmed that the virus can also live on contaminated objects or surfaces.

23.     A scientific study documented in the Journal of Hospital Infection found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for up to nine days.[16] At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter. Therefore, contamination of frequently touched surfaces is a potential source of viral transmission.[17]

24.     Furthermore, on March 27, 2020, the Centers for Disease Control and Prevention ("CDC") released a report entitled "Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020."[18] The report detailed that during this time frame COVID-19 outbreaks associated with three different cruise ship voyages caused over 800

---

[14] *See* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last accessed May 7, 2020) (in a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed case).

[15] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last accessed May 7, 2020).

[16] *See* https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last accessed May 7, 2020).

[17] *See* https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last accessed May 7, 2020) (although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation it seem plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate patient surrounding where the highest viral load can be expected).

[18] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w

confirmed cases and 10 deaths.[19] Of the individuals tested, a high proportion were found to be

asymptomatic, which may explain the high rates on cruise ships. Of particular significance, this

study notes that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic

and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond

Princess cruise line, but before disinfection procedures had been conducted.[20] These facts

demonstrate the uncertainty of COVID-19 and its implications for the safe and lawful

functioning of countless businesses.

      25.     Without a vaccine to protect against COVID-19, effective control of the outbreak

relies on measures designed to reduce human-to-human and surface-to-human exposure. Recent

information on the CDC's website provides that COVID-19 spreads when people are within six

feet of each other or when a person comes in contact with a surface or object that has the virus on

it.[21] Various other sources state that close contact with a person with the virus or surfaces where

the virus is found can transmit the virus.[22]

      26.     The CDC recommends that in viral outbreaks individuals who are infected stay at

home and those who are not sick engage in preventive measures such as constant hand washing

and avoiding activities that would bring them into close proximity of people with the virus or

surfaces where the virus may reside. However, because these recommendations have proven

---

[19] *See* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w (last accessed May 7, 2020).

[20] *Id.*

[21] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html (last accessed May 7, 2020).

[22] Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents, Vol. 104, Kemp., G., et al., JOURNAL OF HOSPITAL INFECTION, No. 3, March 2020, pages 246-251 (last accessed May 7, 2020) (remains infectious from 2 hours to 28 days depending on conditions); *see also* https://www.ucsf.edu/news/2020/02/416671/ how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (doorknobs and table tops can contain the virus); https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal, glass and plastic for several days).

ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing non-essential business establishments and mandating social distancing among the population. This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions. In addition, to conserve medical supplies, state and local authorities have issued orders prohibiting the performance of non-urgent or non-emergency elective procedures and surgeries, which has forced the suspension of procedures at many medical, surgical, therapeutic, and dental practices.

27.     Texas Governor Greg Abbott issued an order on March 22, 2020, postponing all elective surgeries and non-emergency medical and dental procedures. Plaintiffs complied with that order and resumed normal business operations on May 4, 2020.

28.     All but six states have enacted "stay-at-home" orders. Thirty-five states have closed all non-essential businesses, with other states enacting measures to curtail business operations. All fifty states have closed schools.[23]

**B. Defendant's Standard Uniform All-Risk Commercial Property Insurance Policies**

29.     Cincinnati's insurance policies issued to Plaintiffs and the Class Members are "all-risk" commercial property policies that cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

30.     Plaintiffs and Class Members did not participate in the drafting or negotiating of their policies with Cincinnati.

31.     Plaintiffs' Policy, as well as the policies of other Class Members, include standard forms used by Cincinnati for all insureds having applicable coverage. The form policies are used

---

[23] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last accessed May 7, 2020).

by Cincinnati affiliates The Cincinnati Casualty Company and The Cincinnati Indemnity Company.

**C. Plaintiffs' Policy**

32.     Among the coverages provided by the Policy was business interruption insurance, which, generally, would indemnify Plaintiffs for lost income and profits if their business were shut down.

33.     The Building and Personal Property Coverage Form, form FM 101 05 16 in the Policy, provided coverage for Plaintiffs as follows:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

34.     In the same form, the Policy provided the following additional coverage for Plaintiffs:

> (3) Civil Authority
>
> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:
>
> > (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
> >
> > (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

> (1) 30 consecutive days after the time of that action; or
>
> (2) When your "Business Income" Coverage ends;
>
> whichever is later.

35.     The Building and Personal Property Coverage Form defines Business Income as:

> a.   Net Income (net profit or loss before income taxes) that would have been earned or incurred; and
>
> b.   Continuing normal operating expenses incurred, including payroll.

36.     The Building and Personal Property Coverage Form defines Extra Expense as

follows:

(2) Extra Expense

(a) We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs (2)(b), (c) and (d)) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

(b) If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph (2)(c)) to:

> 1) Avoid or minimize the "suspension" of business and to continue "operations" either:
>
> > a) At the "premises"; or
> >
> > b) At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

2) Minimize the "suspension" of business if you cannot continue "operations".

(c) We will also pay expenses to:

1) Repair or replace property; or
2) Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage will be reduced by the salvage value of that property.

37.     The Building and Personal Property Coverage Form provides that Covered Cause of Loss "means direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." "Loss" means accidental physical loss or accidental physical damage. The interruption of Plaintiffs' and other Class Members' businesses were not caused by any of the exclusions set forth in the Building and Personal Property Coverage Form.

38.     Plaintiffs and all similarly situated Class Members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

39.     Applicable case law holds that loss of use of property that has not been physically altered does constitute "physical loss or damage" for purposes of first-party property insurance, such as that contained in the Policy.

40.     As drafter of the Policy, if Cincinnati had wished to exclude from coverage as "physical loss or damage" loss of use of property that has not been physically altered, it could have used explicit language stating such a definition of "physical loss or damage." It did not do so.

41.     Upon information and belief, Cincinnati has nevertheless uniformly refused to pay holders of the above-referenced policies for the interruption of their business operations due to COVID-19. Upon inquiring to the broker who sold them their Cincinnati policy, Plaintiffs were informed that they should not file a claim.

**D. The COVID-19 Pandemic has Affected Policyholders Nationwide**

42.     COVID-19 is physically impacting private commercial property throughout the United States, threatening the survival of thousands of small businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

43.     For example, a bipartisan group from the U.S. House of Representatives recently sent a letter to various insurance industry trade groups requesting that their members recognize financial losses relating to COVID-19 under the standard commercial interruption coverage. In response, the industry trade groups stated: "Business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19."[24]

44.     For instance, Arkansas Insurance Department Bulletin No. 9-2020 states that "In most BII policies, coverage is triggered when the policyholder sustains physical damage to insured property caused by a covered peril resulting in quantifiable business interruption loss. . . viruses and disease are typically NOT an insured peril unless added by endorsement (emphasis in the original).[25]

45.     The South Carolina Department of Insurance issues "Guidance" on business interruption insurance stating that under the business income policy, there likely is no coverage from losses resulting from a virus.[26]

---

[24] https://www.insurancejournal.com/news/national/2020/03/20/561810.html (last accessed May 7, 2020).

[25] https://insurance.arkansas.gov/uploads/resource/documents/9-2020.pdf  (last accessed May 7, 2020).

[26] https://www.doi.sc.gov/948/COVID-19  (last accessed May 7, 2020).

46.     Insurance companies have also been actively advising Insurance Commissioners that they do not intend to provide coverage for business interruption related to COVID-19. As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses because the insurance industry is stating that such policies do not cover COVID-19.

47.     Some state governments expect that insurance companies will breach their obligation to provide coverage for business losses due to the COVID-19 pandemic and have introduced bills requiring every insurance policy insuring against loss or damage to property, which includes the loss of use and occupancy and business interruption, be construed to include, among other covered perils, coverage for business interruption because of global virus transmission or pandemic.[27]

48.     A declaratory judgment determining that the business income loss and extra expense coverage provided in common all-risk commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent Plaintiffs and similarly situated Class Members from being denied critical coverage for which they have paid.

**CLASS ACTION ALLEGATIONS**

49.     Pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following nationwide class (the "Class"):

> All entities who have entered into standard all-risk commercial property insurance policies with Cincinnati, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

---

[27] *See* House Bill No. 858, State of Louisiana House of Representatives. Similar legislation has been introduced in Massachusetts (Senate Bill Senate Docket. 2888); New Jersey (Assembly No. 3844); Sate of New York (Assembly 10226); and Ohio (House Bill No. 589).

Excluded from the Class are the Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly- or partly-owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

50. Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

51. **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, on information and belief, hundreds or thousands of entities in the U.S. have entered into the policies described herein. Those entities' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

52. **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

    a. Whether there is an actual controversy between Plaintiffs and Cincinnati as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all-risk commercial property insurance policies;

    b. Whether measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiffs' and the Class Members' standard all-risk commercial property insurance policies;

c. Whether the measures put in place by civil authorities to stop the spread of COVID-19 caused physical loss or damage to covered commercial property; and

d. Whether Cincinnati has repudiated and anticipatorily breached the all-risk commercial property insurance policies the issued with business interruption coverage by intending to deny claims for coverage.

53. **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class Members. Each Class Member's insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiffs' Policy will address the rights and obligations of all Class Members.

54. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

55. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages

suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

56. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendant or would be dispositive of the interests of members of the proposed Class.

57. **Ascertainability.** The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the class. The Class consists of entities who entered into the above-referenced policies with Cincinnati. Class membership can be determined using Cincinnati's records in its databases.

58. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' interests. Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

## COUNT I
## ANTICIPATORY BREACH OF CONTRACT— BUSINESS INCOME COVERAGE

59.     Plaintiffs repeat the allegations set forth in the foregoing paragraphs as if fully set forth herein.

60.     Plaintiffs bring this Count individually and on behalf of the other members of the Class.

61.     Plaintiffs' Cincinnati Policy, as well as those of the other Class Members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

62.     In the Business Income (And Extra Expense) Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of their operations during the "period of restoration."

63.     In the Business Income (And Extra Expense) Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income as detailed above.

64.     The closure of businesses nationwide caused direct physical loss and damage to Plaintiffs' and the other Class Members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by the closure of businesses nationwide thus triggered the Business Income provision of Plaintiffs' and the other Class Members' Cincinnati policies.

65.     Cincinnati has anticipatorily breached the policies of Plaintiffs and other Class Members who have suffered physical loss or damage to their property because the use of that property has been substantially impaired and, thus, would be entitled to coverage under their Policies under applicable law, but for Cincinnati's anticipatory breach of contract.

66.     Plaintiffs and the other Class Members have complied with all applicable provisions of their policies and/or those provisions have been waived by Cincinnati or Cincinnati

is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

67. As a result of Cincinnati's breaches of the Policies, Plaintiffs and the other Class Members have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

## COUNT II
## DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE

68. Plaintiffs repeat the allegations set forth in the foregoing paragraphs as if fully set forth herein.

69. Plaintiffs' Cincinnati Policy, as well as those of the other Class Members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

70. Plaintiffs and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them.

71. Cincinnati has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

72. An actual case or controversy exists regarding Plaintiffs' and the other Class Members' rights and Cincinnati's obligations under the Policies to reimburse Plaintiffs and Class Members for the full amount of Business Income losses incurred by Plaintiffs and the other Class Members in connection with the suspension of their businesses stemming from orders intended to mitigate the COVID-19 pandemic.

73.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Class Members seek a

declaratory judgment from this Court declaring the following:

      i.      Plaintiffs' and the other Class Members' Business Income losses incurred in connection with the closure of businesses nationwide and the necessary interruption of their businesses stemming from orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

      ii.     Cincinnati is obligated to pay Plaintiffs and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the closure of businesses nationwide during the period of restoration and the necessary interruption of their businesses stemming from orders intended to mitigate the COVID-19 pandemic.

**COUNT III**
**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**

74.     Plaintiffs repeat the allegations set forth in the foregoing paragraphs as if fully set forth herein.

75.     Plaintiffs bring this Count individually and on behalf of the other members of the Class.

76.     Plaintiffs' Cincinnati Policy, as well as those of the other Class Members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and other Class Members' losses for claims covered by the Policy.

77.     Plaintiffs and Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and Class Members are entitled.

78.     Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

79.     An actual case or controversy exists regarding Plaintiffs' and other Class Members' rights and Cincinnati's obligations under the Policies to reimburse Plaintiffs and other Class Members for the full amount of covered Civil Authority losses incurred by Plaintiffs and other Class Members in connection with the closure of businesses nationwide and the necessary interruption of their businesses stemming from the orders intended to mitigate the COVID-19 pandemic.

80.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and other Class Members seek a declaratory judgment from this Court declaring the following:

i.   Plaintiffs' and other Class Members' Civil Authority losses incurred in connection with the closure of businesses nationwide and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

ii.  Cincinnati is obligated to pay Plaintiffs and other Class Members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the closure of businesses nationwide and the necessary interruption of their businesses stemming from the orders intended to mitigate the COVID-19 pandemic.

**COUNT IV**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**

81.     Plaintiffs repeat the allegations set forth in the foregoing paragraphs as if fully set forth herein.

82.     Plaintiffs bring this Count individually and on behalf of the other members of the Class.

83. Plaintiffs' Cincinnati Policy, as well as those of other Class Members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and other Class Members' losses for claims covered by the Policy.

84. Plaintiffs and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and Class Members are entitled.

85. Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

86. An actual case or controversy exists regarding Plaintiffs' and other Class Members' rights and Cincinnati's obligations under the Policies to reimburse Plaintiffs and the other Class Members for the full amount of Extra Expense losses incurred by Plaintiffs and Class Members in connection with the closure of businesses nationwide and the necessary interruption of their businesses stemming from orders intended to mitigate the COVID- 19 pandemic.

87. Pursuant to 28 U.S.C. § 2201, Plaintiffs and other Class Members seek a declaratory judgment from this Court declaring the following:

i. Plaintiffs' and other Class Members' Extra Expense losses incurred in connection with the closure of businesses nationwide and the necessary interruption of their businesses stemming from orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

ii. Cincinnati is obligated to pay Plaintiffs and other Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the closure of businesses nationwide during the period of restoration and the necessary interruption of their businesses stemming from orders intended to mitigate the COVID-19 pandemic.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendant as follows:

A.     Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a) and Rule 23(b)(2) and (3) and declaring Plaintiffs and their counsel to be representatives of the Class;

B.     Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

C.     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses; and

D.     Awarding such other and further relief the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated: May 8, 2020                    Respectfully submitted,


                                      */s/ Christopher B. Sanchez*
                                      Christopher B. Sanchez (N.D. Ill. No.6272989)
                                      Linda P. Nussbaum (*pro hac vice* forthcoming)
                                      Bart D. Cohen (*pro hac vice* forthcoming)
                                      NUSSBAUM LAW GROUP, P.C.
                                      1211 Avenue of the Americas, 40th Floor
                                      New York, NY 10036
                                      (917) 438-9102
                                      csanchez@nussbaumpc.com
                                      lnussbaum@nussbaumpc.com
                                      bcohen@nussbaumpc.com



                                      Michael E. Criden (*pro hac vice* forthcoming)
                                      Lindsey C. Grossman (*pro hac vice* forthcoming)
                                      CRIDEN & LOVE, P.A.
                                      7301 S.W. 57th Court, Suite 515
                                      South Miami, FL 33143
                                      (305) 357-9000
                                      mcriden@cridenlove.com
                                      lgrossman@cridenlove.com

                                      *Counsel for Plaintiffs and the Proposed Class*